## In re DESROCHERS.

(District Court, N. D. New York. January 4, 1911.)

No. 3,789.

1. BANKRUPTCY (§ 114*)—RECEIVERS.

Receivers in bankruptcy are necessary, and should be appointed only when the preservation of the estate demands their intervention.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 165; Dec. Dig. § 114.*]

2. BANKRUPTCY (§ 117*)—RECEIVERS—SALE.

Sales by receivers are justified only when the property is perishable. or is rapidly depreciating in value.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 167; Dec. Dig. § 117.*]

3. BANKRUPTCY (§ 469*)— RECEIVERS—APPRAISEMENT OF ASSETS — NECESSARY PROCEEDING.

Where immediately on the filing of a bankruptcy petition by a dry goods merchant certain lawyers by purchasing a claim and having the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

same assigned to a clerk in the office of one of them obtained the appointment of one of them as receiver on false representations to the judge, and further secured other associated lawyers to be appointed as appraisers who made no proper appraisement, and then sought, but failed, to obtain an order for the immediate sale of the assets which was unnecessary, on false representations that it was necessary, to save rent and because insurance could not be obtained, such receivership and the proceedings thereunder were irregular and improper and of no value to the estate, and hence an allowance would not be made for the services of a receiver or his attorney or those of the appraisers.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 469.*]

In Bankruptcy. In the matter of bankruptcy proceedings of Octavius B. Desrochers. On objections to receiver's accounts and allowances to his attorney and to the appraisers on report of a special master, and motion to confirm. Objections sustained. Allowances denied.

Muhlfelder & Illch, for trustee.

W. E. Ward, for certain creditors.

Benj. Terk, for petitioning creditor for appointment of receiver.

Wm. Dewey Loucks, attorney for receiver.

Del B. Salmon and Geo. G. Schieffelin, appraisers in person.

RAY, District Judge. On the 2d day of February, 1910, Octavius B. Desrochers, the above-named bankrupt, through Mr. Norton of Troy, N. Y., a reputable attorney, filed with the clerk of this court his voluntary petition and schedules in bankruptcy. On the evening before filing such petition he closed and locked his stores, one in the city of Troy, N. Y., and the other in the city of Schenectady, N. Y. He left the stock of goods in each store as they had been while conducting business, and neither removed any of such goods, nor did anything indicating, or that could give rise to a suspicion, that goods were being removed or would be removed from said stores, or either of them, and nothing was done by any person indicating that any removal was going on, or that indicated in any way that the stock of goods or property in either store was being disturbed or in any way interfered with. At the time of filing his said petition Desrochers had not been sued or threatened with any legal proceedings or suits, except it may be inferred that his landlord, one McDonald, intended dispossession proceedings or a suit as he had given until February 2, 1910, for payment of rent.

On February 2, 1910, the same morning said voluntary petition in bankruptcy was filed, Samuel Levy, William Dewey Loucks, and Benjamin Terk, all of the city of Schenectady, were in the city of New York. All three are attorneys of the Supreme Court, state of New York, and of this court, and were ignorant of such bankruptcy proceedings, and of the fact that said Desrochers was in any way financially embarrassed. Neither of them was in any way interested in said matter, nor did they or either of them at that time represent any person interested in the affairs of said Desrochers as creditor or otherwise. The Schenectady store of said Desrochers was nearly opposite the law office of Del B. Salmon. formerly a partner of said Sam-.

uel Levy, and on the morning of February 2, 1910, he noticed that said store was closed, or at least not opened. Thereupon Salmon at Schenectady called up Levy in New York by telephone, but, Levy not being present to answer the call and Loucks and Terk being there, Loucks answered the call, and the matter of getting business out of the Desrochers matter was discussed. Terk, at the suggestion of Loucks, or at least with his knowledge and assent, called up the clerk of the district court at Utica, and learned that a petition in bankruptcy had been filed, but that no receiver had been appointed. Thereupon Loucks drew up in his own handwriting a petition for the appointment of a receiver and also a bond for costs, etc., in case the petition should be dismissed, in which bond the names of Loucks and Terk were inserted as sureties by Loucks himself, a blank space being left in both petition and bond for the name of a petitioning creditor for the appointment of a receiver when one should be found. In the meantime Terk and Loucks were engaged in concert in an effort to find some one who would be willing or consent to act as a petitioner for the appointment of a receiver of the property, etc., of said Desrochers. Neither had any knowledge or information tending to indicate any necessity for the appointment of a receiver in the case. Some of these efforts were made in New York City, but, failing to find any one there who would act as a petitioner on such an application, Loucks and Terk, by telephone, requested one George W. Donnan, who, while an attorney at law, was employed in Terk's law office at Schenectady to go to New York City; the intention being to have him act as petitioner in case a claim should be secured. Donnan went to New York City, arriving there on the morning of February 3d. The same day, February 2d, Loucks returned home to Schenectady, where he arrived after 11 o'clock p. m. Thursday morning, February 3d Loucks reached his office in Schenectady at about 7:30 a. m., and Henry R. Gifford, a clerk in his office, arrived a few minutes thereafter. Loucks then made efforts to find a creditor of Desrochers who would assign his claim to Donnan. He applied to four such creditors, but three of them refused to assign their respective claims, and the claim of the other was too small to be of use. Finally, the Atwood Suspender Company was applied to by Loucks. This company declined to become a petitioner itself, but, having a claim of $23.38 against Desrochers, assigned it to Donnan by written assignment prepared by Loucks, and sent by him to said company by said Gifford for execution, who also took along and delivered the check of said Loucks for $23.38 in payment for such claim. It is at once apparent who the real owner of this claim was. The legal title, however, was in Donnan, as it was assigned to him. Loucks then telephoned what had been done to New York City, and the name of Donnan was inserted in the blank space in the petition for a receiver and affidavit of verification thereto, and the date of such verification was changed from February 2d to 3d. The bond had been executed the day before—that is, February 2d—so far as appears on its face. It recites:

"Whereas a petition has been filed by the above-named bankrupt praying that he be adjudicated a bankrupt and an application has been made by

183 F.—63

George W. Donnan asking for the appointment of a receiver therein: Now, therefore, we, George W. Donnan of Schenectady, New York City, N. Y., as principal," etc.

It is certified by Hazel K. Grandin, a notary public of New York City, under her seal to have been acknowledged by Donnan on the 2d day of February, and to have been subscribed and sworn to as to qualification as sureties by Loucks and Terk on the same day. On that day Donnan was not a creditor or a petitioner. He had no claim against and no interest in the estate of Desrochers. That petition reads as follows, and shows that the name "George W. Donnan" was inserted wherever it occurs after the remainder thereof; except signatures "Geo. W. Donnan" and "Narciso C. Donato," and figures "$2338" and words "for goods sold and delivered and holds no security" had been written by Loucks and written by him before he returned to Schenectady and before Terk returned there from New York, viz.:

'U. S. Dist. Court, N. Dist. N. Y.
"In the Matter of Octavius B. Desrochers, Bankrupt.

"The petition of George W. Donnan respectfully shows to the court:
"That a petition in bankruptcy has been duly filed by the above-named bankrupt asking that he be duly adjudicated a bankrupt in accordance with the acts of Congress relating to bankruptcy, on February 2nd, 1910.
"That the estate of said bankrupt consists mainly of a stock of merchandise in two stores, one in Schenectady and one in Troy in said district and that the value of the same does not exceed the sum of five thousand dollars.
"That your petitioner is a creditor of said bankrupt in the sum of $2338 for goods sold and delivered and holds no security.
"That the stock is of such a nature it can be easily concealed and made away with. That a number of creditors have sued the said bankrupt as your petitioner is informed and believes and are about to levy on the said stock of goods and the said bankrupt has carried away and is carrying away said property for the purpose of concealment. That unless a receiver is appointed at once to take charge of said property until the election of a trustee, the creditors rights and interests will be greatly jeopardized and injured.
"That the petitioner herewith files a bond in the penalty of $250.00 in accordance with section 3-e of the bankruptcy law.
"Wherefore your petitioner prays that Samuel Levy of Schenectady, N. Y., be appointed receiver of said property.      Geo. W. Donnan, Petitioner.
"Benjamin Terk, Atty. for Petitioner,
     "Orpheum Theatre Bldg., Schenectady, N. Y.
"State of New York, County of New York—ss.:
"I, George W. Donnan the petitioner mentioned and described in the foregoing petition do hereby make solemn oath that the statement of fact therein contained are true according to the best of my knowledge, information and belief.      · Geo. W. Donnan.
"Sworn to before me this 3rd day of February, 1910.
          "Narciso C. Donato, Notary Public, N. Y. Co."

The blanks in the petition were filled and the additions made by Terk. The figures "$2338" are in a large bold hand, but on close inspection and with special attention called it can be seen that there is a very fine dot under the lower curl of the second figure "3." The stock of merchandise exceeded $5,000 in value. The statement in said petition is as follows:

"That a number of creditors have sued the said bankrupt as your petitioner is informed and believes, and about to levy on the said stock of goods, and

the said bankrupt has carried away and is carrying away said property for the purpose of concealment."

The only ground stated which could justify the judge in appointing a receiver was wholly false and untrue, and there was no ground of belief that it was true. When that petition was drawn, neither Loucks nor Terk had any information whatever that Desrochers was in serious financial difficulty, and only by the telephone communication from Salmon did they suspect it and by communicating with the clerk's office at Utica only did they learn that a petition had been filed.

This petition for a receiver was presented to the district judge on the 3d day of February, 1910, at his chambers in the city of New York, with the bond mentioned and an order, carbon copy typewritten, but with blank spaces for the name of the bankrupt, the name of the attorney for the petitioners, the name of the receiver, and the penalty of the bond and day of the month. It was dated "2d" in ink "day of February," and the name of the bankrupt had been written in as had the name of the attorney "Benjamin Terk" after some other name had been erased. Attached thereto was this note, the judge being on the bench at the time:

"I take the liberty of suggesting the name of Samuel Levy for appointment as receiver. Mr. Levy is a responsible attorney at law, and he has been named by you as receiver in other matters. Respy, Benj. Terk, Petitioner's Atty."

On this petition and note the judge signed the order, first inserting the name of Levy. The conclusion is irresistible that an understanding existed by which Terk was to act as attorney for the said Donnan. Levy was to be made receiver, and from what had taken place and what immediately took place that Loucks was to act as attorney for the receiver, and that the appointment of said Salmon and said Gifford as appraisers was to be secured. February 3, 1910, the same day, Levy executed a bond as receiver with the American Surety Company as surety, executed also by one Shaible as resident vice president, and attested by said Loucks as resident assistant secretary of the company. The acknowledgment was taken and certified by George G. Schieffelin as notary public, the third appraiser. This bond was presented to the judge, and approved February 4th, and at the same time the appointment of said Del B. Salmon, Henry R. Gifford, and George G. Schieffelin as appraisers was requested, and the judge, in ignorance of the facts, appointed them. It is needless to say that the appointment of a receiver was unnecessary and secured by an imposition on the court, and that, under the circumstances, the appointment of Levy was improper and the selection by him of Loucks as his attorney improper. Loucks asserts that he drew the petition for Terk and at his request as a mere form for the guidance of Terk in a proper case with no idea it was to be used in this proceeding. But how about the bond drawn and executed by him at the same time in this matter in which he was named as a surety? Was that a real bond and intended for actual use? The inventory was commenced very soon, almost at once. On the 5th day of February, 1910, the

day after the appraisers were appointed, and the second day after the receiver was appointed, Loucks appeared as attorney for the said receiver, and drew up and caused to be signed and verified by Levy on the 5th day of February a petition for the sale of the stock of goods in the Schenectady store, by far the largest and most valuable stock, in which is found, after stating, in substance, that the entire stock will inventory about $5,000, the following allegations:

"That the said Dr. George McDonald demands one hundred dollars ($100.-00) a week rent from your receiver, which amount your receiver believes to be the fair rental value of the said store, the said store being very large, although only partially filled with stock. That your petitioner verily believes that the said stock of goods in the Schenectady store should be sold immediately by your said petitioner, at public auction, for the following reasons: If the said sale does not take place at once, and said sale is delayed until after a trustee is appointed, and then and in that event a delay of at least six weeks will occur before a sale can take place under the direction of the trustee, this will mean an outlay of six hundred dollars ($600.00), which can be saved to the creditors by an immediate sale of the assets of the said Schenectady store, and your petitioner verily believes that the said stock should be sold at once, in order to save said item of six hundred dollars ($600.00). For the further reason that your petitioner has endeavored to obtain insurance upon the said stock, in the city of Schenectady, N. Y., and that the said insurance has been absolutely refused, no matter what price your petitioner would pay for the same, by reason of the character and situation of the stock, and for the further reason that it is a bankrupt stock. Your petitioner further believes that a sale should take place upon five days' notice to all creditors mentioned in the schedules, and upon publication in a newspaper in the city of Schenectady, N. Y., where your receiver resides, and has his place of business, daily for five days, so that an additional week's rent may be saved, by cutting the sale from 10 days to five days' notice. Your petitioner further shows: That the expense of having a caretaker take care of the heater and attend to the building will be saved, if said sale can be had at the earliest possible moment. That the said goods, or a majority of them, are of a perishable nature, and especially of an inflammable nature, and come under the meaning and purview of general order XVIII [89 Fed. viii. 32 C. C. A. xx], and therefore the five days' notice can be held as sufficient. That the Troy store is not situated as the Schenectady store is, and there is no very large rental being run up, and therefore the sale of the Troy store is not deemed necessary by your petitioner."

The district judge refused to grant the order presented and prayed for, which was drawn by the attorney for the receiver in accordance with the suggestions and recommendations of the petition, and struck out all provisions for a sale and inserted a clause granting permission to remove the entire stock into one store. This was not done, the saving of the rent suggested by the petition not appealing to the business instincts and enterprise of the receiver and of his attorney. The taking of the inventory was continued and resulted in an appraisal by the receiver of the Schenectady stock at $1,800.43, fixtures at $246.20, total $2,046.63, of the Troy stock at $2,899.08, fixtures $1,-299.75, total $4,198.83, grand total $6,245.46. It has been shown beyond dispute and without substantial contradiction that no part of either stock of goods was perishable in its nature, and that there was no difficulty in obtaining or continuing insurance.

In the meantime Loucks, Salmon, and Terk were writing letters to the creditors, or some of them, of Desrochers, each stating, in substance, that he represented a number of creditors and soliciting

claims and power of attorney to vote for the trustee. Terk's letter in evidence is dated February 3d, and reads as follows:

"Benjamin Terk, Attorney and Counselor at Law, 409 State Street,
Schenectady, N. Y.

"February 3d, 1910.

"Mohawk Valley Paper Co., Albany, N. Y.

"Gentlemen: I have been retained by several of the creditors of Octavius B. Desrochers, who is in business in this city and also in Troy, and am seeking to obtain the assistance of other creditors in order that a trustee may be appointed who will represent the creditors and not be friendly to the bankrupt.

"I am informed that the bankrupt himself, through an attorney, has sent out a circular letter to creditors with a view to obtaining the appointment of a friendly trustee.

"If you desire to co-operate with us will you kindly send me a proof of claim and power of attorney properly executed. There will be no cost to you for filing the same and I will immediately take up with you the matter of finding a trustee who will be mutually satisfactory.

"Respectfully,                                    Benjamin Terk."

The letter of Loucks in evidence is dated February 3d, and reads as follows:

"County Attorney.
"U. S. Commissioner.

"Wm. Dewey Loucks, Lawyer,
"Parker Bldg., Schenectady, N. Y.

"February 3rd, 1910.

"Nussbaum-Livingstone Co., Albany, N. Y.

"Dear Sir: Octavius B. Desrochers of Schenectady and Troy has filed a petition in bankruptcy, and I am informed that his attorney is sending out circular letters, requesting forbearance on the part of creditors, and the said attorney is attempting to control the selection of a trustee. Concededly, a trustee representing the bankrupt, is ridiculous.

"I represent a number of creditors, and am seeking to co-operate with other creditors, in the selection of a proper trustee, who will represent the creditors and not the bankrupt.

"In this matter, I enclose you blank proof of claim and power of attorney, and if you desire to join in a movement of this kind, if you will send the same to me, properly executed, there will be no charge for filing the same, and I will submit to you the name of the proposed trustee, before voting upon the same.        Very truly yours,                    Wm. Dewey Loucks."

The similar letter of Salmon is dated February 7th. Here evidently was a concerted effort to control the appointment of the trustee. This effort was not successful, and at the first meeting of creditors held February 15, 1910, one Gilbert Doctor, an upright and experienced business man, was appointed trustee and qualified as such. He found the inventory and appraisal made by the receivers and the appraisers named, Salmon, Gifford, and Schieffclin, so erroneous and incorrect as to be misleading, untrustworthy, and worthless. The referee appointed appraisers skilled in the business, and they with the trustee inventoried and appraised the Schenectady stock at $5,254.60 and fixtures at $2,000, total $7,254.60 as against $1,800.43, the receiver's valuation of the stock, and $246.20, his valuation of the fixtures, total $2,046.63. And the trustee appraised the Troy stock at $1,689.55 and the fixtures at $1,500, total $3,189.55, as against $2,899.08, the receiver's valuation of the stock, and $1,299.75 for the fixtures, total

$4,198.83. This throws some light on the anxiety of the receiver and his attorney to procure an order for the sale of the Schenectady stock on five days' notice, one-half the time required by law. If the court had accepted the allegations of the petition as true and ordered the sale as of perishable goods on short notice and 75 per cent. of the appraised value as fixed by the receiver had been offered and accepted the Schenectady stock would have gone for $1,350.32, about one-third its actual cash value as after-events demonstrated by bankrupt sale. If it had sold for the full appraised value as fixed by the receiver and his appraisers, it would have gone for about one-half its actual value at bankrupt sale as afterwards demonstrated.

It is not necessary to infer an intent on the part of any one to sacrifice the Schenectady stock in the interest of any person or persons. It is evident that had the policy and requests of the receiver and his attorney been acceded to by the court that stock would have been sacrificed; that the services rendered by both the receiver and his attorney were without value or benefit to the estate is self-evident. In fact, these acts have injured the estate. These acts at best show great carelessness and inattention on the part of both the receiver and his attorney. As the alleged services were not only worthless to the estate, but unnecessary, and this fact became apparent and was well known to both immediately after the appointment, no compensation to either from the estate is warranted or justified. The voluntary petition in bankruptcy was filed on the morning of February 2d. The adjudication was made February 3d. The bankrupt was directed to attend before the referee February 9th. A meeting of creditors was held February 15th, on notice served February 5th, and a trustee appointed on that day, the 15th, and he qualified and executed his bond the same day, and it was approved and filed the next day, February 16th. The petition to sell the stock at Schenectady on short notice was urged upon the judge February 11th, four days before the meeting of creditors at which a trustee was to be appointed by the referee. The fact that a meeting of creditors was to be held on the 15th was not disclosed to the judge, but the inference was conveyed that the appointment of a trustee was to be delayed.

The appointment of a receiver was entirely unnecessary. The employment of an attorney for the receiver was unnecessary. No legal questions were involved. If the stock of dry goods in either store was in danger of damage from the cold or dampness, it was a part of the duty of the receiver to see to it that coal was purchased and fires kept. It does not appear that the bankrupt or his attorney would have allowed any damage to the stock. The character and standing of Mr. Norton repels the suggestion. The application to the court for a speedy sale was unnecessary and unwarranted both in fact and law. It was a part of the duty of the receiver to give a bond and the services of an attorney in that regard were unnecessary. It was the duty of the appraisers to make a correct and a true inventory, giving their personal attention thereto. If unable to do so, it was their duty, respectively, to refuse to act. The evidence shows conclusively that the two stocks of goods were not handled by the appraisers or their alleged assistants with any care or view of ascertaining the true

value, if at all, and, in any event, assistance was unnecessary. The typewriting in making the inventory was done by stenographers and typewriters in the office and employ of Loucks. The evidence and report of the special master show correctly and in considerable detail what the appraisers actually did. Clearly they did not do their duty or examine the stock. Neither one of them did an actual full day's work unless it be Salmon. Schieffelin merely looked over the report of Salmon regarding the Schenectady stock, and spent about four hours at the Troy store. He was the managing clerk in Loucks' law office. Loucks really owned the assigned claim, and Donnan employed as an assistant in the making of the inventory was the legal owner. Neither he nor Gifford had any qualifications for appraiser in such a matter except in a mere clerical capacity. Gifford did not examine the stock in the Schenectady store at all, but he and Schieffelin looked over the fixtures. Salmon spent about four or five hours in the Schenectady store dictating to stenographers from Loucks' office, and this covers substantially the extent of his real work at that store. Later he spent one day at Troy to verify the list of that stock prepared by Gifford, Schieffelin, and one Carl S. Salmon, a brother of Del B. Salmon. It is evident that such an appraisal was worthless, and that an estate in bankruptcy should not be subjected to the burden of compensating appraisers for time spent in acting in that manner. While the typewriters from Loucks' office acted in good faith, so far as appears, and did quite a large amount of typewriting, they were employed by Loucks, and, if paid, were paid by him in their regular course of employment. Their work was of no value to the estate. These appraisers present a bill for five days' services each, and each asking for $50—that is, compensation at the rate of $10 per day. The affidavit annexed to the bill does not state the extent of service, but places stress on the alleged difficulties attending the work. They say, not that they spent five days each in making the inventory, but:

"That the said taking of the appraisal of the said property of the said bankrupt was unusually difficult for the reason that the stock of goods to be appraised consisted of a great many thousand items each of which had to be handled and appraised by the said appraisers and counted."

This was not true, but, if it ought to have been done, it was not done. The receiver, Samuel Levy, in his account, prepared by Loucks and verified by himself, charges as an expense paid February 11, 1910, "To expenses W. D. Loucks to New York City to interview Judge Ray as to instructions in regard to receivership $18." This was the application for the sale of the Schenectady stock already referred to. The interview with Judge Ray occupied about 10 minutes, and resulted as stated, in an order to transfer the Schenectady stock to Troy so as to save the large rent. In the same account Levy as receiver makes the following charge:

"To cash paid five assistants, including three stenographers at $3. per day each for four days in assisting in taking inventory in the two stores of bankrupt, $60."

He attached to the account voucher for this as follows: Receipt of Carl S. Salmon for $12; of Geo. W. Donnan (who petitioned for

the receiver) for $12; of M. McManus for $12; of A. M. Brickner for $12; and of J. A. Myers for $12, total $60. Neither of these persons had been or has been paid by the receiver or by Loucks. In his account against the receiver and presented to the court for allowance Loucks made the following additional charge:

"Feb. 8, 9 & 10, To services of W. D. Loucks and three stenographers and one assistant in office in preparation of inventory of bankrupt and reducing same to proper form to be filed $75.00."

This would make the expense of taking the inventory, not including traveling expenses and hotel bills, the accuracy and value of which has been mentioned, as follows: Three appraisers, $150; to Loucks, attorney, and three stenographers and one assistant. $75; to assistants in sorting stock and taking inventory, $60—total, $285.

And in addition the receiver in his account verified and signed by him says:

"That the undersigned with the three appraisers with three stenographers and with three assistants, in addition to three stenographers, was constantly engaged from the 4th day of February, 1910, to the 10th day of February, 1910, taking an inventory of the stock of goods in the two stores," etc.

The evidence taken by the special master fully sustains him in finding that this was untrue. The inventory is on file and was filed with the clerk February 15, 1910, and is made up of (1) the oath of said appraisers taken February 4th; (2) the certificate of said appraisers, which reads as follows:

"In the United States District Court, for the Northern District of New York.

"In the Matter of Octavius B. Desrochers, Bankrupt.

"We, the undersigned, having been notified that we were appointed to estimate and appraise the property of the above named bankrupt in the Schenectady store, have attended to the duties assigned us and after a strict examination and careful inquiry we do estimate and appraise the said property of the said bankrupt as set forth in detail upon the annexed pages.

"In witness whereof we have hereunto set our hands at Schenectady, N. Y., this 8th day of February, 1910.          Henry R. Gifford,
"George S. Schieffelin,
"Del B. Salmon,
"Appraisers."

It is dated February 8th. The words "in the Schenectady store" have been inserted with ink and pen at some time. There is no certificate or statement attached that the Troy store was ever inventoried. The "annexed pages" cover both the Schenectady and the Troy stores. Gifford and Schieffelin have filed affidavits that on the 10th "did put together the said inventory and obtained the execution thereof upon the 10th day of February, 1910." There is no execution of it except the certificate, and one half hour's work would have put the pages together. The receiver by his said attorney submitted a claim of $100 as compensation for his services. As the receiver did substantially nothing outside of taking the inventory, assuming he did the work claimed in that regard, at least $50 of his claim should be charged to expense of inventory, swelling the cost to $335, which the court was asked to allow and charge against and direct paid from this estate.

Said Benjamin Terk, who took the part in this transaction above described, submitted an affidavit on which he claimed an allowance for obtaining the appointment of the said receiver which reads as follows:

"United States District Court, Northern District of New York—ss.:

"In the Matter of Octavius B. Desrochers, Bankrupt.

"State of New York, City and County of Schenectady—ss.:

"Benjamin Terk, being duly sworn says that he is an attorney at law and resides and has his office in the City of Schenectady, N. Y., and is licensed to practice in this Court; that he was the attorney for the petitioner for the appointment of a receiver herein, and upon such petition, Samuel Levy, the receiver, was so appointed; that deponent prepared all the papers upon such petition, including the petition, petitioner's bond, order appointing receiver, arranged for the receiver's bond, prepared order appointing appraisers and he incurred an expense of $4.75 in connection with said proceedings.

"Wherefore deponent asks that he be given an allowance of the reasonable value of his said services and that he be reimbursed for such expenditures so made by him.                                                   Benjamin Terk.

"Sworn to before me March 21, 1910.                            .
                          "Geo. W. Donnan, Commissioner of Deeds."

As Loucks drew the petition and the bond, and as the order appointing the receiver was merely a carbon copy of an order in some other case, or one on hand for use in any case and was furnished by Loucks, and the order appointing the appraisers could not have occupied over ten or fifteen minutes in its preparation, it is seen that Terk did not prepare "all the papers upon such petition" except in the sense that he filled in the blank spaces as stated, but this fact was not shown to the court. At best, such affidavit was calculated to mislead the court. It is now claimed, in substance, that Loucks was acting as attorney or mere amanuensis for Terk; but, in view of all the undisputed facts, this seems improbable. All the facts recited and others are found by the special master, Edwin A. King, to whom the whole matter was referred for examination and report, with considerable amplification in many respects, except I have gone to the papers on file for quotations and some facts not stated in detail by him. Mr. King is a gentleman of the highest character and standing. He was appointed referee in bankruptcy by Judge Coxe in 1898, and has been continued by me. His honor and integrity and ability have never been questioned, except by these appraisers in their affidavits filed in answer to the objections to the receiver's account. In view of all the facts, I do not think their impeachment of Mr. King in an attempt to defend their own acts entitled to weight. It only deepens the color of their own acts. He has given this matter, on the objections made and filed, careful and conscientious attention, and his findings of fact and report are conservative. They are fully sustained by the evidence. I do not see how he could have found the facts otherwise than he has. This court is compelled to sustain the findings. It regrets the necessity of so doing. Mr. Loucks, Mr. Levy, and Mr. Salmon have enjoyed the confidence of this court in bankruptcy matters, notwithstanding considerable complaint and many rumors of discontent, these never assuming the form of formal objections, however, until the objecting parties here, as was their duty, presented this case for investigation. Although the order of reference did not contemplate an examination of

the witnesses separately, it was so worded as to permit it. The special master, probably wisely in the interest of truth and the honest administration of justice, conducted the examination in that manner for some time, but later, understanding the attitude of the court, all the parties in interest with counsel were permitted to be present and to amend and add to their statements and call witnesses. No injustice was done. Confronted with the situation, Loucks admits that it was a mistake to procure the appointment of this receiver, and that the receivership was unnecessary, and he says that when he discovered this, which was when he learned the name of the attorney for the bankrupt, he tried to turn it to the advantage of the estate and creditors. When communicating with the clerk's office at Utica, February 2d, it would have been easy to learn the name of Desrochers' attorney. And the continuance of the inventory and the application for a sale of the Schenectady stock on short notice made February 11th, and after he knew who Desrochers' attorney was, and the running up of expenses, etc., as described are hardly consistent with the claim now made. The account of the receiver drawn by Loucks was verified February 26, 1910. That account, among other things, says:

"Schedule B, hereto annexed, contains a statement of all the moneys paid out by the undersigned in the administration of the said estate, and the indebtedness incurred in said administration with the exception of the receiver's attorney, Wm. Dewey Loucks, and also includes the moneys paid in accordance with the order of the court made upon February 4, 1910, for a caretaker to take care of the heater and for coal to run the same."

Schedule B contains the item of $60, viz.:

"To cash paid five assistants, including three stenographers, at $3. per day each for four days in assisting taking inventory in the two stores of bank-rupt."

As the special master finds and as the evidence conclusively shows the receiver had made no such payments. Did he suppose Loucks, his attorney, had made these payments? If so, the items should have been included in Loucks' bill as disbursements made by him, but this would not have done, as Loucks included in his unpaid bill a charge of $75 for the three stenographers and one assistant, including his own services on the inventory. The vouchers acknowledge payment from Levy, not Loucks. The evidence is that Loucks, not Levy, if any one, had agreed to pay. The verification of that account signed by Levy says:

"That the payments reported in said account to have been made by the said receiver have been made and that said account hereto annexed is true," etc.

After the objections to the account were filed and the order of reference to a special master was made, Mr. Loucks made a long affidavit, verified March 30, 1910, in which he took the position that, when he learned on returning to Schenectady February 3d that his bank was not affected by the failure of Desrochers, he lost all interest in the receivership, etc.; also, that the petition and proposed order for a sale of the property in the Schenectady store was mailed to Judge Ray in New York February 5th, and that as the judge did not grant or return the order he sent Schieffelin to New York on the 9th to urge the mat-

ter, and that Schieffelin returned on the 10th with information that
the judge would not grant the order without further information as
to the showing of the inventory, whereupon he, Loucks, immediately
went to New York to see the judge regarding it at an expense of $18
cash and two days' time.  Clearly it was not necessary to go to New
York City to induce the judge not to sign the proposed order which
he had already refused to do, and it is evident the situation had not
changed, and that no actual fact existed justifying such order.  Judge
Ray on the 11th again refused to sign it, but did authorize a transfer
of the Schenectady stock to Troy to save the $100 per week rent for six
weeks and the expense of coal and caretaker, but which was not done.
The trips of Schieffelin and Loucks to New York City on the 9th and
10th, respectively, and after Loucks states he had lost interest in the
receivership, and which were made to induce the judge to sign the
order authorizing a speedy sale on that petition, which by silence he
had declined to do prior to the appearance before him of Schieffelin,
and which in words to him he refused to do, are conceded facts abso-
lutely inconsistent with a claim of loss of interest in the receivership,
and such visits were absolutely unnecessary.  These acts fail to indi-
cate a desire to turn an unnecessary receivership to the benefit of the
estate, but something quite different.  It was the urging of the court
to grant an improper order upon a petition containing unjustifiable
allegations, and the purpose is, I think, plainly inferable.  In relation
to the bond of $250, Loucks states that he executed it in blank.  This
was, of course, indiscreet and improper.  The only blank was for the
name of a petitioning creditor not yet found when the bond was ex-
ecuted.  Loucks also swears in his affidavit:

"That in the application for the receivership this deponent was not present
when the petition for the receiver was executed, but had simply drawn a
blank form for such application for receiver, the attorney who was going to
make said application and sign the same, stating that he did not know the
form to use without a form book, and deponent simply drew a proposed blank
form of petition which deponent supposed the said attorney for petitioner,
Benjamin Terk, would fill out to conform to the facts of the case when it
was executed."

The great difficulty with this statement is the fact that only three
blank spaces were left in the petition drawn by Loucks in his own
handwriting, viz., one for the name of the petitioner, one for the
insertion of the amount of the claim, barely sufficient for the insertion
of the dollar mark and four figures, and the last one for the signature
of the petitioner above the word "Petitioner" at the end of such peti-
tion proper.  The words "Wherefore your petitioner prays that Sam-
uel Levy of Schenectady, N. Y., be appointed receiver of said prop-
erty," are in Loucks' handwriting.  He knew who the court was to
be asked to appoint.  The words "for goods sold and delivered and
holds no security" are an interlineation by Terk, coming in at the
top of the second page, however.  When Loucks reached Schenectady
on the morning of February 3d, his first inquiry should have been at
his own bank as to whether or not it was interested.  He did learn
that it was not a creditor early that day.  Rather than inquire at his
own bank, he made three unsuccessful efforts to obtain a petitioner

for a receiver, and finally purchased a small claim of $23.38 and paid for it himself, and had it assigned to the clerk, Donnan, and then sent word to New York City to execute the petition which had been left with Terk. All due allowance is to be made for youth, inexperience, excessive zeal, a desire for business, haste, misinformation, etc. When Loucks found his bank and his clients were not interested, he should have abandoned all efforts for a receiver. When he found the receivership was unnecessary, he should have brought the fact to the attention of the court or the judge, instead of continuing an expensive inventory and sending a clerk in his office to New York City, and then going himself at an expense of $18 cash and two days' time to press for an order for an immediate sale of a stock of dry goods on one-half the legal notice on 'the ground such stock was perishable, and that insurance could not be obtained, when, in fact, insurance then existed and was in force, and a rebate was had later by the trustee, and the stock was not perishable. Again, in his affidavit, Loucks makes unwarranted charges against the special master, as do the clerks in his office, Schieffelin and Gifford, two of said appraisers. If the judge had been apprised of the fact that Loucks was to act as attorney for the receiver, Levy, a lawyer, it is improbable that he would have appointed Salmon, a lawyer, and formerly a partner of Levy, the one who conveyed information to Terk and Loucks in New York that the Desrochers store was closed, and Gifford, and Schieffelin, both in Loucks' office, one a lawyer and the other a law student, to appraise these stocks of dry goods. Appraisers must be disinterested and competent in the line of work to which they are assigned by the court. The evidence concedes that it was understood before Loucks left New York that he was to act for the receiver Levy, if appointed. Terk was not dealing fairly with the court when he suggested Salmon, Schieffelin, and Gifford for appointment as appraisers. The court or judge in appointing appraisers at points far distant and in localities where the judge has little or no acquaintance must necessarily depend largely on the representations of the attorney requesting the appointment. It seems to me inconceivable that a reputable attorney exercising good, honest judgment, would ask the appointment of two lawyers and a law student to make the inventory and appraisal of a stock of dry goods in the hands of a receiver who was also a lawyer with a fifth lawyer for adviser. Clearly no sane judge would knowingly make such an appointment, except for special and extraordinary reasons. If the judge cannot rely upon the statements in the papers presented and upon the fairness and honesty of the attorneys coming before him and the truth of their representations, the administration of justice is indeed hampered and obstructed, if not made impossible. Dividends in bankruptcy matters depend upon the careful and economical administration of the estate. Receivers are necessary only when the preservation of the estate demands their intervention. Sales by receivers are justified only when property is perishable or is rapidly depreciating in value on a falling market or for other reasons. No bankrupt estate should be charged with the expense of such a proceeding except in case of plain necessity.

I must refuse to allow any compensation to either the receiver or his attorney or to the attorney for Donnan the petitioner or said appraisers, or any of the expenses incurred or paid by them or either of them. The rent of the Schenectady store which was occupied from February 3d to February 15th will be paid by the trustee, also the coal bill and caretaker. The trustee will also pay to Edwin A. King, the special master, the sum of $170 for his services, and $6.88 for his personal expenses at and to and from Schenectady and $90.60 for stenographer's services, in all $267.48, all of which is allowed and will be paid from the estate. He will also pay his own attorneys their reasonable charges and Walter E. Ward, representing certain objecting creditors, the sum of $50, and also his disbursements, which is allowed to him, as he has substantially aided the trustee and his attorney in protecting and preserving this estate.